UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:09-00193 |
| | ) | Judge Wiseman |
| TONY DONNELL McCOLLEY | ) | |

## MEMORANDUM

This matter is before the Court on Defendant Tony McColley's Motion to Suppress (Docket No. 39), to which the Government responded in opposition (Docket No. 40). On December 15, 2010, the Court held an evidentiary hearing on the Motion, after which the parties filed post-hearing Memoranda (Docket Nos. 54, 55 & 58).

## I. FINDINGS OF FACT

Having reviewed the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court finds the following to be the facts which are relevant to Defendant's Motion to Suppress[1]:

Patrol officers Michael Gray ("Officer Gray") and Jonathan Frost ("Officer Frost") of the Metropolitan Nashville Police Department ("MNPD") work together in a "flex unit" as a part of the Operation Safe Street program. That program brings together officers from various precincts who focus on high crime areas in an effort to ferret out illegal activity.

Officers in the unit do not handle regular dispatch calls, but rather concentrate on traffic violations in a "proactive" effort to make traffic stops. Officers in the flex unit work as a team, and

---

[1] Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the fact found. Further, the Court omits from its recitation most facts which it deems immaterial to the issues presented by Defendant's Motion to Suppress, but will amplify the facts where necessary for purposes of the legal discussion.

1

provide assistance and backup if they see another officer involved in a traffic stop.

During the early evening hours on August 8, 2009, Officers Gray and Frost were sitting in an unmarked police vehicle in the parking lot of a Pilot Truck Stop located off Trinity Lane, the environs of which are designated as a high crime area. Officer Frost was in the driver's seat and Officer Gray was in the front passenger seat. Neither was wearing a police uniform.

Officer Gray observed a white Ford Crown Victoria drive past, heading westbound down Trinity Lane. It appeared to Officer Gray that no license plate was displayed on the back of the car, and he reported that observation to Officer Frost who then pulled out onto Trinity Lane.

Within about two blocks, the officers caught up to the Crown Victoria and, from a vantage point of less than two vehicle lengths, Officer Gray saw that the car did in fact have a temporary licence plate mounted in the license plate slot. However, not all of the information on the license could be read because it was covered by a tinted license plate cover.

At the time the officers noticed the tinted cover, both vehicles were stopped at a red light. Once the light turned green, the vehicles turned right, heading northbound on Brick Church Pike. After a couple of blocks, Officer Frost activated the unit's overhead lights and the Crown Victoria pulled to the side of the road, near the intersection of Brick Church Pike and Ewing Drive. The location of the traffic stop was approximately two miles from the Pilot Truck Stop.

Three individuals were riding in the Crown Victoria. Arquita Coons ("Ms. Coons") was the driver, and Defendant Tony McColley was sitting in the front passenger seat. A male friend of Defendant was riding in the back seat on the passenger side.

Officer Frost approached the driver's side of the vehicle, while Officer Gray approached the passenger side. Officer Frost spoke with Ms. Coons and told her that he was an MNPD officer and that she was stopped because her license plate had a tinted cover. In response to his request, Ms.

Coons gave Officer Frost her driver's license and the paperwork for the Crown Victoria.

Meanwhile, Officer Gray asked both individuals on the passenger side of the vehicle for photo identification.[2] Defendant told Officer Gray that he did not have an identification card, but that his name was "Sanchez Rucker." Defendant claimed that he did not know his Social Security number.[3]

Both officers returned to their unmarked unit. Officer Frost ran Ms. Coons' license and determined that it was valid. The paperwork belonging to the car also checked out. Officer Gray ran "Sanchez Rucker" through the computer, but found no local arrest history for an individual with that name.

While in the car, Officer Gray informed Officer Frost that he recognized the driver from an encounter he had had with her a month or so earlier when marijuana was recovered in a car that Ms. Coons was driving.[4] Officer Gray told Officer Frost that they should attempt to elicit Ms. Coons' consent to search the vehicle.

---

[2]At Defendant's request, the Court has reviewed the transcript of the preliminary hearing in state court (Def. Ex. 1) and notes there is some discrepancy between the testimony there and the testimony here as to who actually asked Ms. Coons for her driver's license and told her the reason for the stop. At the state court hearing, Officer Gray says that he explained the reason for the stop and asked all of the occupants for their identification, whereas, in this case, Officer Frost testified that he was the one who initially spoke with Ms. Coons. The Court does not believe Officer Gray intended to be deceptive at either hearing because, as he put it, he "can't be certain who asked who for what." (Supp. Tr. 44). Regardless, none of this is material to the underlying issues presented by the suppression motion.

[3]Contrary to the suggestion made by defense counsel through questioning at the suppression hearing (Supp. Tr. 42), Officer Gray did, in fact, testify in the state court preliminary hearing that he asked Defendant to identify himself and provide his name and social security number. (Def Ex. 1 at 5, 10).

[4]The record reflects Ms. Coons was arrested on March 16, 2009 for possession or casual exchange of narcotics and cited for having no driver's license on that date. She also has been arrested previously on at least three other occasions for the possession or casual exchange of narcotics. (Docket No. 55-1).

As Officers Frost and Gray began to walk back up to the Crown Victoria to seek consent, another patrol car carrying two officers arrived. Those officers stationed themselves behind the scene so as to provide cover.

Officer Frost asked Ms. Coons to step out and come to the rear of the vehicle so that he could talk to her about the covered plate. Ms. Coons told Officer Frost that she had just purchased the Crown Victoria the day before and that the tinted cover came with the car.[5]

Officer Frost asked Ms. Coons if he could search the vehicle. Ms. Coons claims she initially hesitated, but agreed to a search when Officer Frost threatened to bring a canine unit to the scene if she did not consent. She admits that no guns were drawn during the encounter. Ms. Coons also testified that she had been subjected to 10 to 15 traffic stops in the past year, and that during those stops she had been informed that, since she had a previous drug conviction, officers could search her car on that basis alone. Importantly, neither Officer Frost nor Officer Gray made those statements to Ms. Coons, and there is no evidence that they were aware any such statements had been made to Ms. Coons in the past.

The exchange between Officer Frost and Ms. Coons was overheard by Officer Gray. Both officers testified that Ms. Coons consented to a search, and Officer Frost testified that he did not recall threatening to call for a canine unit.

After weighing the conflicting testimony on whether Officer Frost told Ms. Coons that a canine unit would be called if she did not consent to a search, the Court finds that no such representation was

---

[5]It is unclear from the testimony whether this explanation was given when Ms. Coons went to the rear of the vehicle, or at the time of the initial contact by Officer Frost.

made.[6] The Court discounts Ms. Coons' testimony because her testimony was not credible in several respects. As the Court stated during the suppression hearing, Ms. Coons' claim that she had been stopped 10 of 15 times in the past year for license plate issues "stretches credibility." (Supp. Tr. 103). Likewise, Ms. Coons' credibility was damaged when she insisted that her last arrest occurred some four or five years before the stop when, in fact, she had been arrested for possession of narcotics on March 16, 2009 – less than five months before the traffic stop in this case.

Returning to the narrative of events, after Ms. Coons consented to the search, she was patted down by Officer Frost and told to stay at the rear of the car. Officers Frost and Gray then approached the passenger side of the vehicle. Officer Frost asked the rear seat passenger to exit the vehicle and, as that individual began to do so, Defendant also got out of the car. When Defendant got out, he turned facing the vehicle, and Officer Gray saw him throw a balled-up piece of paper on the ground. Officer Gray also saw a bulge in the right rear pocket of Defendant's pants. To Officer Gray, it looked like "something heavy" and "similar to a handgun" was in the pocket. (Supp. Tr. 21).

Having observed what he believed to be the outline of a handgun in Defendant's pocket, Officer Gray reached for Defendant's arm, but Defendant took off running down Brick Church Pike. Both Officer Frost and Officer Gray pursued Defendant and yelled at him to stop. The two officers who had arrived at the scene remained with Ms. Coons and the other passenger. Between eight and ten minutes elapsed from the time the traffic stop was initiated and Defendant fled the scene, and approximately one minute elapsed from the time of Ms. Coons' consent until Defendant's flight.

---

[6]Officer Gray was not asked about any statements relating to a canine unit being called to the scene. For his part, Officer Frost testified that he did not recall making any such statement, which Defendant reads as meaning that Officer Frost, in fact, may have made such a statement. However, having heard the testimony in context, the Court concludes that Officer Frost disavowed any claim that he threatened to call for a canine unit, as evidence by his caught-off-guard response, "Bring the dogs in? I don't recall that, no." (Supp. Tr. 98).

5

After a "couple of hundred meters" during which time Officer Gray saw Defendant repeatedly pull up the right side of his pants, the officers caught Defendant when another patrol car pulled up and blocked Defendant's path. A brief struggle ensued, and Defendant was placed in custody. Defendant had a loaded .357 Rossi handgun in his right rear pocket, and he was found to be carrying approximately 25 grams of marijuana and 35 grams of powder cocaine. Defendant also had identification in his pocket which indicated that his real name was Tony McColley.

Ms. Coons was not issued a traffic citation for driving with tint-covered plates. She did, however, receive a citation for having a digital scale in her purse. The day after the stop, Ms. Coons removed the temporary license plate from the holder and placed the plate in the back window of her car.

Based on these events, Defendant was charged in this Court with being a felon in possession of a firearm, possessing with intent to distribute cocaine, and possessing a firearm in furtherance of a drug trafficking crime. His Motion to Suppress followed.

## II. **APPLICATION OF LAW**

Defendant's Motion to Suppress seeks to preclude introduction at trial of "all evidence and statements obtained from the illegal search and seizure of the vehicle and of Mr. McColley on August 8, 2009 in Nashville, Tennessee." (Docket No. 39, at 1). Several issues are presented for resolution by the Motion, including (1) whether the traffic stop was legal and, if so, (2) whether it was unlawfully extended, and (3) whether Ms. Coons voluntarily consented to the search. The Court considers those issues in turn.

**A. Legality of the Initial Traffic Stop and the Extension of the Stop**

"When law enforcement officers witness a traffic violation, they may stop the driver and his car," because "there is nothing 'unreasonable' about stopping a vehicle whose driver has just

6

committed a traffic violation." United States v. Street, 614 F.3d 228, 232 (6th Cir. 2010). This remains so, even if the traffic violation is not an arrestable offense. Id.

Under Tennessee law, it is illegal to drive a motor vehicle with license plates which are obscured or have a tinted cover. Specifically, T.C.A. § 55-4-110 provides in relevant part:

> (b) *Every registration plate shall at all times be* securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches (12") from the ground, measuring from the bottom of the plate, *in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible*; provided, if a motorcycle is equipped with vertically mounted license plate brackets, its license plate shall be mounted vertically with the top of such license plate fastened along the right vertical edge. *No tinted materials may be placed over a license plate even if the information upon the license plate is not concealed.*

T.C.A. § 55-4-110(b)(italics added). An observed violation of this statute provides reasonable suspicion sufficient to warrant a traffic stop. United States v. Simpson, 520 F.3d 531, 541 (6th Cir. 2008).

Here, there can be little doubt but that the Crown Victoria driven by Ms. Coons on August 8, 2009 had a license plate with a tinted cover. Both officers so testified without contradiction, and the day after the stop Ms. Coons placed the plate (sans cover) in the rear window of the car, presumably to comply with the statute. Further, given this Court's factual findings, the traffic stop occurred only after the officers observed the tinted covering, and it was initiated at least in part because of the tinted cover over the license plate.

The fact that the officers were working in a flex unit as part of Operation Safe Streets, and in that role may have desired to uncover more than a minor traffic violation in stopping the Crown Victoria, does not change things. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Thus, "even if [the] decision to stop [a vehicle]

for a traffic violation was a pretext to fish for evidence of other crimes," this does not support the conclusion that the traffic stop was invalid at its outset. United States v. Everett, 601 F.3d 484, 488 (6th Cir. 2010). In other words, so long as there is an articulable legal basis for the stop, "the officers' actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop." United States v. Shank, 543 F.3d 309, 313 (6th Cir. 2008); see United States v. Garrido, 467 F.3d 971, 978 (6th Cir. 2006) (citation omitted) ("'A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct.'").

Having determined that the initial stop was valid, the question becomes whether the officers exceeded the scope of the stop because "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). The Sixth Circuit recently reiterated its long-standing position that "'the principles announced in Terry v. Ohio[, 392 U.S. 1 (1968),] define the scope of reasonable police conduct' during traffic stops." Everett, 601 F.3d at 488 (quoting United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999)).

Under Terry, a stop must be reasonably related in terms of scope and duration to the circumstances justifying the stop and "'last no longer than is necessary to effectuate the purpose of the stop.'" Id. (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). Nevertheless, a traffic stop may be extended if something occurs during the stop which generates reasonable suspicion "that criminal activity was afoot." United States v. Torres-Ramos, 536 F.3d 542, 550 (6th Cir. 2008).

Here, Defendant offers little to suggest that the initial stop was invalid, but insists that its duration was unlawfully extended. In his view, once officers determined that Ms. Coons had a valid license and the car was hers, the need for the traffic stop ceased and he (and the others in the car) should have been free to leave.

8

In so arguing, Defendant misconstrues the purpose of the traffic stop. The traffic stop was not merely to determine the driver's license status or whether the car was stolen. Rather, the avowed purpose of the stop was to address the tinted license plate cover, and that issue had not been resolved at the time that Ms. Coons was asked for consent. Instead, the decision of whether to issue a citation for the violation was left to the two officers who remained on the scene once Defendant fled. See United States v. Dixon, No. 09-3996, 2010 WL 5135570, at *2 (6th Cir. Dec. 15, 2010) (purpose of traffic stop was not completed when officer asked passenger to exit the vehicle because the officer "had not yet completed his actions in connection with the issuance or non-issuance of a citation to [the driver] for driving a vehicle with only a single operative headlight"). Moreover, the officer's decision to ask for consent to search "alone d[oes] not extend the stop beyond its permissible scope." United States v. Blair, 524 F.3d 740, 752 (6th Cir. 2008); accord United States v. Burton, 334 F.3d 514, 518-19 (6th Cir. 2003).

Regardless, there was more going on than addressing Ms. Coons' license status and the tinted plate. Officers Gray asked the passengers for identification, as he was entitled to do. See United States v. Fernandez, 600 F.3d 56, 62-63 (1st Cir. 2010) (collecting numerous authorities); see also United States v. Suarez, No. 94-5134, 1995 WL 29454 at *4 (6th Cir. Jan. 25, 1995) (officer "was justified in stopping [defendants], based on the traffic violation, for a reasonable amount of time, in order to investigate matters concerning the traffic violation – the identity of the occupants, whether [the driver] had a valid driver's license, ownership of the van"). Defendant provided a false name and claimed not to recall his Social Security number, something which piqued Officer Gray's curiosity. This curiosity turned to suspicion when the provided name – "Sanchez Rucker" – returned no results. Officer Gray was entitled to investigate the matter, to include further questioning of "Sanchez Rucker." See United States v. Ellis, 497 F.3d 606, 613-14 (6th Cir. 2007) (trooper "was justified in asking the

9

occupants general questions of who, what, where and why regarding their 3:23 a.m. travel" and further detention was warranted where, among other things, trooper was unable to confirm passenger's false alias); United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009) (additional delay beyond purpose of initial stop was "independently warranted by the officer's reasonable suspicion, based on [passenger's] implausible answers and nervous demeanor, that [passenger] was giving a false name and might be involved in other criminal activity"); United States v. Brigham, 382 F.3d 500, 509 (5th Cir. 2004) ("Once the officer learned that [the passenger's] I.D. was likely false, [the officer] acted reasonably, with further questioning, to uncover [the passenger's] true identity and perform a correct background check."); United States v. Smith, 164 F. App'x. 825, 828 (11th Cir. 2006) (the continued detention of the vehicle for a not unreasonably long period was warranted where, among other things, officer suspected passenger of giving false name based on passenger's body language and inability to provide Social Security number).

The touchstone of the Fourth Amendment is reasonableness. Ohio v. Robinette, 519 U.S. 33, 39 (1996). While a traffic stop "may become an impermissible 'seizure if it occurs over an unreasonable period of time or under unreasonable circumstances,'" United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005) (citation omitted), there was nothing unreasonable here either in terms of the length of time or the circumstances surrounding the stop. Only eight to ten minutes elapsed between the initiation of the traffic stop and Defendant's decision to flee, during which time the officers checked Ms. Coons' license status and her ownership of the Crown Victoria, and attempted to confirm the identity of "Sanchez Rucker." See United States v. Sharp, 470 U.S. 675, 686 (1985) ("In assessing whether a [stop] is too long in duration . . . , we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."); Ellis, 497 F.3d at 613 (22-minute seizure prior to consent to search not unreasonable where

10

a "large portion of this detention was necessitated by the purpose of the initial stop and the need for the trooper to identify the occupants of the vehicle and determine the driver's ability to safely operate the vehicle").

**B.  Validity of Ms. Coons' Consent**

Defendant argues that even it the initial stop was valid, and even if the stop was lawfully extended, the evidence against him must be suppressed because the Government has not shown that Ms. Coons knowingly and voluntarily consented to a search of the vehicle. This Court disagrees for several reasons.

First, the issue of Ms. Coons' consent is, as a practical matter, irrelevant. The search of the vehicle did not lead to the discovery of the weapon in Defendant's back pocket, but rather was the result of Officer Gray's asking Defendant to step out of the car. As just explained, that request came while the resolution of the tinted license plate was yet to be resolved, and while the officers were still uncertain as to Defendant's true identity. It is beyond dispute "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997). It is also clear that an officer may conduct a pat-down search if he observes what he reasonably believes to be the outline of a gun. See Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (finding reasonable suspicion that individual may be armed based solely on officer's observance of bulge in defendant's jacket and upholding pat-down search on that basis).

Second and relatedly, it does not appear that Defendant has standing to challenge Ms. Coons' consent.[7] In support of his position that he has standing, Defendant cites Brendlin v. California, 551

---

[7]The Court recognizes that "'[s]tanding to challenge a search or seizure is a matter of substantive Fourth Amendment law rather than of Article III jurisdiction" and therefore "'the government can waive the standing defense by not asserting it.'" United States v. Dyer, 580 F.3d 386, 390 (6th Cir. 2009) (citation omitted). However, Defendant has the burden of establishing

11

U.S. 249 (2007).

In <u>Brendlin</u>, the Supreme Court held that a passenger in a motor vehicle has standing to challenge the *legality of a traffic stop*. However, this conclusion did not alter its earlier opinion in <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978), that a passenger has no standing to object to a search of a vehicle over which he has no possessory or ownership interest. <u>United States v. Ubaldo-Viezca</u>, No. 09-16341, 2010 WL 3895710, at *5 (11th Cir. Oct. 6, 2010); <u>see</u> <u>United States v. Villaverde-Leyva</u>, No. 1:10-035, 2010 WL 5579825, at *15 (N.D. Ga. Dec. 9, 2010) (collecting cases indicating that majority of courts have concluded that <u>Brendlin</u> does not modify <u>Rakas</u> as it relates to a passenger's standing to contest the search of another's vehicle). Since Ms. Coons's consent related to the search of her vehicle, it would not appear that Defendant has standing to challenge the voluntariness of that consent. <u>See</u> <u>United States v. $14,000 in U.S. Currency</u>, No. 98-4380, 2000 WL 222587, at *3 n.4 (6th Cir. 2000) (a passenger does not have standing to contest the voluntariness of a driver's consent to search an automobile); <u>United States v. Saenz</u>, No. 99-20276, 2000 WL 33725117 at *7 (W.D. Tenn. Mar. 22, 2000) (same).

The post-<u>Brendlin</u> Sixth Circuit decision in <u>Ellis</u> supports this conclusion. There, the Sixth Circuit explicitly agreed with the trial court's holding on the issue of standing:

> A passenger in a vehicle ordinarily has no expectation of privacy in the vehicle, and thus does not have standing to challenge the validity of consent given by the driver of the vehicle. . . . However, courts have distinguished standing to challenge consent from standing to challenge evidence discovered as fruit of an unlawful detention.

<u>Ellis</u>, 497 F.3d at 612 (internal citation to <u>Rakas</u> omitted). This is in keeping with <u>Brendlin</u>'s

---

standing, <u>United States v. Domenech</u>, 623 F.3d 325, 328 (6th Cir. 2010), and, in his Motion to Suppress, he linked standing solely "to the stop and its duration." (Docket No. 39, at 3). Indeed, it was not until the hearing that Defendant vicariously raised the issue of the Ms. Coons' consent. In these circumstances the Court finds it appropriate to address Defendant's standing to challenge the validity of Ms. Coons' consent.

recognition of Wayne LaFave's observation in his search and seizure treatise that "'[i]f either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations.'" Brendlin, 551 U.S. at 259 (citation omitted).

Here, the Court has already concluded that neither the stopping of the Crown Victoria, the length of the subsequent detention, nor the request that the occupants exit the vehicle was unreasonable under the Fourth Amendment. As such, it would appear that Defendant is not in a position to argue about the voluntariness of Ms. Coons' consent – that is a claim only she can assert. See United States v. Hardin, 539 F.3d 303, 428 (6th Cir. 2008) (because Fourth Amendment rights are personal and may not be vicariously asserted, a defendant may only assert his own rights). The only possible harm to Defendant through the officers' request to search was the additional time it took to make that request, but, as already noted, the mere request for consent to search does not impermissibly extend a traffic stop. Blair, 524 F.3d at 752.

Even if Defendant has standing to challenge the validity of Ms. Coons' consent, the Court finds that, in light of the totality of the circumstances, Mrs. Coons knowingly and voluntarily consented to a search of her vehicle.

"The government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,' . . . that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." United States v. Canipe, 569 F.3d 597, 602 (6th Cir. 2009) (internal citation omitted). "Whether these requirements were met 'is a question of fact to be determined from the totality of all the circumstances[.]'" Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). The characteristics of the accused and the details of the interrogation are relevant in making the voluntariness decision, "including the youth of

13

the accused, h[er] lack of education, h[er] low intelligence, the lack of any advice to the accused of h[er] constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." Id. at 603.

In this case, the preponderance of the evidence shows that Ms. Coons voluntarily gave consent to search her vehicle. This finding is supported by the "clear and positive testimony" of Officers Gray and Frost, both of whom stated uncategorically that Ms. Coons consented to the search of the Crown Victoria. Additionally, Ms. Coons herself testified that she gave consent to search. Although Ms. Coons claims that her assent occurred only after Officer Frost threatened to call for a canine, the Court does not find this to be the case.

Apart from the officers' explicit testimony, the characteristics of Ms. Coons also weigh in favor of a finding of voluntariness. At the time of the traffic stop, Ms. Coons was twenty-five years old. (Docket No. 55-1, at 1). While the Court does not know Ms. Coon's educational background, English is obviously her native language and she certainly was capable of understanding and responding appropriately to the officers' inquires and to the questions asked of her at the evidentiary hearing. See United States v. Gamez-Acuna, 375 F. App'x. 809, 815 (10th Cir. 2010) (finding of consent supported where record showed defendant was able to understand and respond appropriately to trooper's questions); United States v. Munoz-Villalba, 251 F. App'x. 90, 93 (3rd Cir. 2007) (defendant's ability to understand and respond to questions at suppression hearing supported conclusion that defendant voluntarily consented to search of his vehicle). Further, Ms. Coons is far from a novice regarding traffic stops (by her own – probably inflated – account, she was stopped around a dozen times in a year), and she is familiar with the criminal justice system, having been convicted of drug offenses on several occasions. See United States v. Comstock, 531 F.3d 667, 677 (8th Cir. 2008) (citation omitted) (with regard to consent "Defendant's prior convictions suggest he had an 'increased awareness of his

rights'"). Even though the record contains no evidence that Ms. Coons was informed about her constitutional rights, including the right to refuse, this is but one factor to be considered, and not the "*sine qua non* of an effective consent." United States v. Drayton, 536 U.S. 194, 206-07 (2002).

Finally, the circumstances surrounding the request for consent support a finding of voluntariness, notwithstanding the fact that Ms. Coons did not believe she was free to leave at the time the request was made. See Robinette, 519 U.S. at 35 ("defendant [need not] be advised that he is 'free to go' before his consent to search will be recognized as voluntary"). The duration of the stop was extremely brief and Ms. Coons was asked for consent within 8 to 10 minutes of the initial stop. Further, there is no suggestion that she underwent repeated or prolonged questioning, either in relation to the traffic stop, or the request to consent. Nor is there any evidence that she was subjected to any sort of deprivation or punishment in order to exact consent. Ms. Coons' interaction was solely with Officers Frost and Gray, and while two other officers were on the scene, they were in the background, and no handguns were drawn. See, United States v. Johnson, 109 F. App'x. 76, 80 (6th Cir. 2004) (in determining voluntariness of consent, three police officers was not "not an overwhelming number"); United States v. Barnum, 564 F.3d 964, 970 (8th Cir. 2009) (citation omitted) ("the mere presence of 'two to three officers' being armed with holstered firearms,' in the absence of evidence of threats or intimidation, does not negate a defendant's consent"); United States v. Pena, 143 F.3d 1363, 1367 (10th Cir. 1998) (holding consent was voluntary notwithstanding presence of four armed officers where "none of the officers unholstered his firearm").[8]

---

[8]Given this Court's findings, Defendant's reliance upon Judge Higgins' decision in United States v. Page, 154 F. Supp. 2d 1320 (M.D. Tenn. 2000) is misplaced for several reasons. There, unlike here, a narcotics dog was in fact called to the scene and this occurred after the reason underlying the traffic stop had been resolved. There, unlike here, there was no reasonable suspicion of any other unlawful activity which would warrant further investigation. And there, unlike here, the defendant consented to a search of his vehicle only after the officer threatened that "he could and

15

### III.  **CONCLUSION**

On the basis of the foregoing, Defendant's Motion to Suppress (Docket No. 39) will be denied.

_____
THOMAS A. WISEMAN, JR.
UNITED STATES DISTRICT JUDGE

---

would run a narcotics dog around his truck without a warrant[.]" Id. at 1328.  Interestingly enough, in ruling on the consent issue, Judge Higgins opined that had defendant consented at the outset, and before the threat of a drug dog being called, "his consent and subsequent search would clearly have been valid[.]" Id.